**REVISED January 15, 2014**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States Court of Appeals
Fifth Circuit**

**F I L E D**

May 15, 2013

Lyle W. Cayce
Clerk

No. 11-20816

WELLOGIX, INC.,

Plaintiff-Appellee,

v.

ACCENTURE, L.L.P.,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before DeMOSS, SOUTHWICK, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

Plaintiff-Appellee Wellogix, Inc. alleged that Defendant-Appellant Accenture, L.L.P, misappropriated its trade secrets. After a nine-day trial, a jury returned a unanimous verdict against Accenture, awarding Wellogix compensatory and punitive damages. After a careful review of the record, we find that there was sufficient evidence to support the jury's verdict, and the resulting damages awards. *See Lavender v. Kurn*, 327 U.S. 645, 653 (1946) ("Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."). Had we sat in the jury box,

No. 11-20816

we may have decided otherwise. "But juries are not bound by what seems inescapable logic to judges." *Morissette v. United States*, 342 U.S. 246, 276 (1952). Guided by this deference, we AFFIRM.

## I. Facts and Proceedings

The oil and gas industry spends "billions of dollars" each year to construct oil wells. Yet, traditionally, oil companies planned such projects over "coffee and doughnuts," using paper records to track and pay costs. And, to the extent that they employed computer software, they relied on "basic tools" such as Excel. Due, in part, to this "paper process," oil companies struggled to estimate certain well construction costs—known as "complex services." Even modest improvements in how companies estimated such costs could save "[h]undreds of millions of dollars."

Wellogix, Inc.—motto: "[m]aking the complex simple"—sought to modernize this process. Wellogix developed software that allowed oil companies to "plan, procure, and pay for complex services"—all online. The software featured: "dynamic templates" that adjusted cost and supply estimates based on "intelligence built into" the underlying source code;[1] a "workflow navigator" that provided a framework for planning and procuring services; and "electronic field tickets" that allowed suppliers to record information about orders.

Wellogix was, according to its CEO, the only company offering complex services software from 2000 to 2005. However, Wellogix's software was not a stand-alone solution. Wellogix instead relied on other companies' software to perform core accounting functions.

To fill this technology gap, Wellogix entered into an agreement in 2005 with the software company SAP. The agreement allowed Wellogix to integrate

---

[1] Source code is the set of instructions that computer programmers write in specialized computer language to cause a software program to function.

No. 11-20816

its complex services software with SAP's accounting software. As part of the agreement, Wellogix provided its source code to SAP.

To promote its software, Wellogix entered into six marketing agreements with the consulting firm Accenture, L.L.P. Wellogix also participated in pilot projects with oil companies. Wellogix shared source code and access to its technology with both Accenture and the oil companies, subject to confidentiality agreements.

Some of the pilot projects involved Accenture. For example, Wellogix and Accenture worked together in 2000 on an "eServices" pilot that provided BP America, Inc. ("BP") with access to the "dynamic template" and "workflow navigator" features. Others did not. For example, Wellogix worked with a different consultant on a 2004 "eTrans" pilot for BP.

As part of "eTrans," BP implemented Wellogix software at two well sites. BP also hosted a confidential online portal that allowed Wellogix to share files and information with BP employees. Although a BP manager considered the pilot a success, BP discontinued the project in 2005 "due to cost and internal integration issues."

After "eTrans," BP sought to implement global software that "was not just for complex services, but was for [its] entire . . . system." To that end, BP sponsored a new pilot, known as "Purchase-to-Pay," or "P2P." BP instructed Accenture to select a software provider.

SAP and Wellogix pitched their integrated software to Accenture in May 2005. As part of the pitch, Wellogix described the software's dynamic templates.

Without notifying Wellogix, Accenture and SAP began developing the complex services component of the global software for BP.[2] As they developed

---

[2] Accenture and SAP worked together in 2004 to develop an application with a complex services component, known as "xIEP." Accenture and SAP intended to integrate Wellogix's software into xIEP, but ended the project before developing the complex services feature.

3

No. 11-20816

the component, Accenture and SAP apparently accessed Wellogix technology —including flow diagrams, design specifications, and source code critical to Wellogix's software—that had been uploaded to the confidential eTrans portal.

Wellogix sued BP, Accenture and SAP in district court in 2008, alleging that they had stolen and misappropriated Wellogix trade secrets. District Judge Keith Ellison dismissed SAP from the lawsuit for lack of venue.

Wellogix and BP agreed to arbitrate. Judge Ellison, acting as the arbitrator, found that Wellogix's source code was a trade secret, but that BP did not use the code. However, Judge Ellison found that BP breached its confidentiality agreement with Wellogix by making Wellogix's confidential information accessible to Accenture and SAP.

Wellogix's suit against Accenture proceeded to trial. The jury returned a verdict for Wellogix, awarding $26.2 million in compensatory damages and $68.2 million in punitive damages. Accenture renewed its motion for judgment as a matter of law, and also filed a motion for a new trial. Judge Ellison denied both motions except to suggest a remittitur of the punitive damages award to $18.2 million—the amount Wellogix sought at trial. Wellogix accepted the remittitur, and the district court entered final judgment. Accenture appeals.

## II. Accenture's Motion for Judgment as a Matter of Law

"Although we review denial of a motion for judgment as a matter of law *de novo* . . . 'our standard of review with respect to a jury verdict is especially deferential.'" *SMI Owen Steel Co. v. Marsh USA, Inc*, 520 F.3d 432, 437 (5th Cir. 2008) (quoting *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 235 (5th Cir. 2001)). In reviewing the record, "we draw all reasonable inferences in favor of the nonmoving party, and . . . may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see Brown v. Bryan Cnty.*, 219 F.3d 450, 456 (5th Cir. 2000). This is because "[c]redibility determinations, the weighing of the evidence, and the

4

drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). Accordingly, we do not find that the district court erred unless "the evidence at trial points so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316, 1323 (5th Cir. 1994).

1. Misappropriation

"Trade secret misappropriation under Texas law is established by showing: (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff."[3] *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994); *see also Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991), *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).

*a) Existence of Trade Secret*

"'The existence of a trade secret is properly considered a question of fact to be decided by the judge or jury as fact-finder.'" *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004) (quoting RESTATEMENT (THIRD) UNFAIR COMPETITION § 39 cmt. (1995)). A trade secret "is any formula, pattern, device, or compilation of information used in one's business, and which gives an opportunity to obtain an advantage over competitors who do not know or use it." *Taco Cabana*, 932 F.2d at 1123; *see Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958). To determine whether a trade secret exists, we consider six factors, weighed "in the context of the surrounding circumstances":

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken

---

[3] The parties do not dispute that Texas law applies.

by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others

*In re Bass*, 113 S.W.3d 735, 739-40 (Tex. 2003) (quoting RESTATEMENT OF TORTS § 757 cmt. B. (1939)); *see Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 267 (5th Cir. 2007).

Here, Wellogix presented sufficient evidence and testimony to support the jury's finding that Wellogix's technology contained trade secrets. Wellogix showed that, because it was the only company offering complex services software from 2000 to 2005, its software—and, in particular, the underlying proprietary source code—gave it "an opportunity to obtain an advantage over competitors." *Taco Cabana*, 932 F.2d at 1123. Wellogix also showed that the six *Bass* factors weigh in its favor. For example, Wellogix introduced evidence that it "guard[ed] the secrecy of" its technology, *see Bass*, 113 S.W.3d at 739, by placing its software behind a firewall, and sharing it subject to confidentiality agreements. Wellogix also introduced evidence that its technology had "value," *see Bass*, 113 S.W.3d, because other companies partnered with Wellogix, and, as discussed below, third-party investors valued Wellogix at more than $27 million.

Accenture argues that Wellogix's technology was not "secret" because Wellogix disclosed it to the public in patents and patent applications. However, as the district court instructed the jury, a patent destroys the secrecy necessary to maintain a trade secret only when the patent and the trade secret "both cover the same subject matter." *Luccous v. J. C. Kinley Co.*, 376 S.W.2d 336, 340 (Tex. 1964); *see Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x. 714, 719-20 (5th Cir. 2006) (upholding the jury's verdict on the basis that the jury "could have concluded-and apparently did conclude-that the [plaintiff's] patents did not reveal [its] trade secrets"). Neither party in this case introduced Wellogix's patents into

evidence.    In fact, Wellogix argued against introducing patent-related documents, fearing prejudice.    Although Accenture maintains that it was Wellogix's burden to show that the patents did not cover the same subject matter, Accenture does not cite, nor we could we find, case law imposing such a burden.  Further, another circuit, in an unpublished opinion, held that it is for the defendant, once a plaintiff makes a *prima facie* case for the existence of a trade secret, to show that disclosure destroys the secret. *See Injection Research Specialists, Inc. v. Polaris, L.P.*, Nos. 97-1516, 97-1545 & 97-1557, 1998 WL 536585, at *8-9 (Fed. Cir. Aug. 13, 1998).

Accenture argues that, even if Wellogix's patents did not disclose the trade secrets, there was insufficient evidence that Wellogix even possessed such secrets.  Accenture contends, for example, that technical information related to the eTrans pilot was not a trade secret because Wellogix published a document containing the information on its public website.  Accenture adds that, without entering into confidentiality agreements, Wellogix provided other companies with documents containing "process flow" maps of the eTrans project.  However, Wellogix software expert Kendyl Roman testified that, while some trade secrets appeared on Wellogix's website, others did not.  In addition, the district court instructed that the jury could not find that there was a trade secret on the basis of the "process flow" maps.  "A jury is presumed to follow its instructions[,]" *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and Accenture has not overcome this presumption.

*b) Acquisition of Trade Secret*

"One is liable for disclosure of trade secrets if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in one who is in a confidential relationship with another who discloses protected information to him." *Phillips v. Frey*, 20 F.3d 623, 630 (5th Cir. 1994); *see Huffines*, 314 S.W.2d at 769.  "Improper means of acquiring another's trade

secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W. 3d 616, 636 (Tex. App. 2007) (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 43 (1995)).

Here, Wellogix presented sufficient evidence and testimony to support the jury's finding that Accenture improperly acquired Wellogix's trade secrets. Wellogix showed: that it entered into six confidential agreements with Accenture; that, through the marketing agreements, Accenture had access to Wellogix trade secrets; that Accenture also had access to Wellogix trade secrets uploaded to the confidential eTrans portal; and that an Accenture email referenced "harvesting IP" from Wellogix. Together, this evidence and testimony supports the "legitimate inference[,]" *Reeves*, 530 U.S. at 150, that Accenture acquired Wellogix's trade secrets.

Accenture argues that there was no evidence, other than expert Roman's testimony, that Wellogix's trade secrets were on the eTrans portal. Accenture maintains that Roman's testimony was not probative because Roman did not have personal knowledge that certain trade secrets were on the portal. However, as an expert, Roman did not need "firsthand knowledge or observation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). Indeed, Roman conceded that he lacked such knowledge. Instead, Roman testified that, in his experience in the software industry, he believed it likely that companies working together on a pilot project would share documents containing trade secrets on an online portal. He added that he based this belief, in part, on a BP contractor's deposition testimony that information resembling Wellogix's trade secrets was on the eTrans portal. Given that "an expert is permitted wide latitude to offer opinions," *Daubert*, 509 U.S. at 592, and that, as

discussed below, Roman's testimony was sufficiently "reliable" and "relevant," the jury was reasonable in crediting his testimony.

Accenture also argues that Wellogix CEO Ike Epley's "vague and unsupported" testimony does not show that Accenture acquired Wellogix's trade secrets. Accenture maintains that Epley's testimony that one of Wellogix's pilot partners, Trade Ranger, "had access" to Wellogix source code does not "support the inferential leap" that Accenture had such access. Accenture adds that it could not access Wellogix's source code because, as CEO Epley testified, the code was behind a firewall. However, Accenture's involvement in the Trade Ranger pilot—Accenture "was the consultant and the implementer [of software] for Trade Ranger"—supports the inference that Accenture could have accessed Wellogix source code through the pilot. Further, Epley's testimony that Wellogix kept its source code behind a firewall for the eTrans project does not preclude a jury from finding that Accenture otherwise had access to the code. For example, a jury could have inferred that Accenture gained such access by entering into six confidentiality agreements with Wellogix. Although Accenture notes that Wellogix corporate representative John Chisholm testified that Wellogix never gave Accenture access to its source code, we decline to assume "jury functions" by weighing Chisholm's credibility against Epley's. *See Reeves,* 530 U.S. at 150.

*c) Use of Trade Secret*

> As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use[.]" . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute "use."

*HAL*, 500 F.3d at 451 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 (1995)). "Use" can include "activities other than the actual selling of the product." *Dresser-Rand Co. v. Virtual Automatic, Inc.*, 361 F.3d 831, 840 (5th

No. 11-20816

Cir. 2004); *see ForScan Corp. v. Dresser Indus., Inc.*, 789 S.W.2d 389, 395 (Tex. App. 1990) (finding that attempts to market a product constituted "use"). Indeed, an act that "lower[s] the market value" of a trade secret by "making it less likely that [the plaintiff] would sell his invention to [the defendant's] competitors" could amount to "use." *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2010).

Here, Wellogix presented sufficient evidence and testimony to support the jury's finding that Accenture used its trade secrets. Wellogix showed: that Accenture joined with SAP to develop a complex services component for BP's P2P pilot; that, around the time that Accenture and SAP partnered, they were able to access Wellogix's dynamic templates source code that had been uploaded to the confidential eTrans portal; that an Accenture document referenced the "creation of . . . complex service templates," and then "right below" stated: "Use Wellogix content"; that the same document provided that the templates "better deliver similar or better functionality than Wellogix or we may have a problem"; that other Accenture documents referenced Wellogix's templates, and that, as the pilot progressed, a BP employee told Wellogix that the company should: "sue Accenture . . . [b]ecause Accenture was utilizing [Wellogix's] confidential information and building out [its] functionality." Together, this evidence and testimony supports the "legitimate inference[,]" *Reeves*, 530 U.S. at 150, that Accenture used Wellogix's trade secrets.

Accenture acknowledges that it developed complex services templates for the P2P pilot, but argues that its templates lacked "dynamic" features, and therefore were "nothing like Wellogix's." Accenture notes that Wellogix CEO Epley recognized that "Wellogix doesn't own the concept of templates." However, the standard for finding "use" is not whether Accenture's templates contained Wellogix trade secrets, but whether Accenture "rel[ied] on the trade secret[s] to assist or accelerate research or development" of its templates. *HAL*, 500 F.3d at

10

451 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40). A jury could "legitimate[ly] infer[,]" *Reeves*, 530 U.S. at 150, on the basis of, for example, the Accenture email suggesting that the company should "[u]se Wellogix for content," that Accenture "rel[ied]" on Wellogix's templates to develop its own. *See HAL*, 500 F.3d at 451.

Accenture argues that Roman's testimony about the meaning of certain terms in Accenture documents, such as "development," was "pure conjecture, which cannot sustain the judgment." However, as an expert with experience in the software industry, Roman had the requisite "experience, training, or education" to testify as to the software industry's understanding of such terms. *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting FED. R. EVID. 702); *see United States v. Tucker*, 345 F.3d 320, 327-28 (5th Cir. 2003) (finding that the district court's exclusion of an expert's proposed testimony on the technical meaning of the term "invest" was "improper" because the testimony was "relevant to the issue of the definition of 'invest'"). Further, even without Roman's testimony, a jury could "legitimate[ly] infer[,]" *Reeves*, 530 U.S. at 150, based on the plain language of the documents—for example, Accenture's reference to "us[ing] Wellogix for content"—that Accenture used Wellogix's trade secrets.

Relying on *Wilmington Star Mining Co. v. Fulton*, 205 U.S. 60, 78-79 (1907), and *Rutherford v. Harris Cnty.*, 197 F.3d 173, 185 (5th Cir. 1999), Accenture argues for the first time on appeal that, "because the evidence supporting [Wellogix's xIEP] theory was insufficient, and because it is impossible to know whether the jury improperly relied on it in finding misappropriation, Accenture is at least entitled to a new trial." Accenture does not direct us to any request to the district court for a special verdict, FED. R. CIV. P. 49(a), nor to a request for answers to questions, FED. R. CIV. P. 49(b), nor to any pertinent objection to the jury submission and charge, FED. R. CIV. P. 51, nor, later, to any

No. 11-20816

request for verdict clarification, nor, finally, to any such contention of inherent ambiguity in the general verdict in their new trial motion. In such circumstances, with no objection made as to form or substance, we have explained that a request for retrial has not been preserved. *See Pan E. Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1123-25 (5th Cir. 1988) (forfeiture from arguing only that none of the possible theories of recovery were supported by the evidence, not that the cause should be reversed and remanded if any one of the theories was invalid); *In re A.V.*, 113 S.W.3d 355, 363 (Tex. 2003); *McCord v. Maguire*, 873 F.2d 1271, 1274 (9th Cir. 1989).[4]

Because Wellogix showed that Accenture used its trade secrets for the P2P pilot, we decline to address whether Wellogix showed that Accenture also used Wellogix's trade secrets for the xIEP application or SAP's core accounting software.

2. Compensatory Damages

---

[4] Even if preserved, this argument applies to cases "[w]hen a district court submits two or more alternative grounds for recovery to the jury on a single interrogatory," *Reeves v. AcroMed Corp.*, 44 F.3d 300, 302 (5th Cir. 1995), yet one theory proves to be erroneous, whereas, in this case, the evidence showing that Accenture used Wellogix trade secrets for the P2P pilot, xIEP application, and SAP's core accounting software supported a single, valid legal theory: that Accenture entered into a confidential relationship with Wellogix, and then breached that confidence by using the trade secrets for Accenture's benefit. *See Walther v. Lone Star Gas Co.*, 952 F.2d 119, 126 (5th Cir. 1992) ("[W]e will not reverse a verdict simply because the jury might have decided on a ground that was supported by insufficient evidence. Instead we must assume that the jury considered all of the evidence in reaching its decision."), *opinion on reh'g*, 977 F.2d 161, 162 (5th Cir. 1992) ("Jurors are well equipped to analyze the evidence and reach a decision despite the availability of a factually unsupported theory in the jury instructions."); *Prestenbach v. Rains*, 4 F.3d 358, 361 n.2 (5th Cir. 1993) ("[A] jury verdict may be sustained even though not all the theories on which it was submitted had sufficient evidentiary support."); *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 577 n.8 (5th Cir. 2001); *E. Trading Co. v. Refco, Inc.*, 229 F.3d 617, 621-22 (7th Cir. 2000). As closing arguments demonstrate, Wellogix's case rested overwhelmingly on misappropriation arising from the P2P project. *See Muth v. Ford Motor Co.,* 461 F.3d 557, 564-65 (5th Cir. 2006) (distinguishing *Wilmington Star* by observing that "this Court, as well as many others, have engrafted a sort-of harmless error gloss onto the basic principle" that "if both theories are put to the jury, a new trial is generally necessary when the evidence is insufficient on one").

No. 11-20816

"If the use of trade secrets results in economic injury to the employer, an award of actual damages is . . . a proper remedy." *Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1180 (5th Cir. 1983) (citing *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 314 S.W.2d 782, 792 (Tex. 1958)). "Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret, the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a 'reasonable royalty.'" *Bohnsack*, 668 F.3d at 280 (internal citations omitted). "This variety of approaches demonstrates the 'flexible' approach used to calculate damages for claims of misappropriation of trade secrets." *Id.*; *see Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974) ("The case law is thus plentiful, but the standard for measuring damages which emerges is very flexible."). Under this "flexible approach," even "[w]here the damages are uncertain . . . we do not feel that uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown." *Univ. Computing*, 504 F.2d at 539; *see Carbo*, 166 F. App'x at 724 (finding that "plaintiffs are entitled to adapt their damages theory to fit within the particular facts of the case"). "'[I]t will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *DSC Commc'ns Corp. v. Next Level Communications*, 107 F.3d 322, 330 (5th Cir. 1997) (quoting *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 24 (5th Cir. 1974)); *see Downtown Realty, Inc. v. 509 Tremont Bldg., Inc.*, 748 S.W.2d 309, 313 (Tex. App. 1988).

Here, Wellogix presented sufficient evidence and testimony to support the jury's $26.2 million compensatory damages award to Wellogix. Wellogix introduced testimony by damages expert Michael Wagner that the company was

13

worth $27.8 million in 2005—the amount, apparently after deducting for licensing fees, that the jury awarded Wellogix.  Wellogix showed that Wagner based his valuation, in part, on the decision by venture capital groups to invest $8.5 million in Wellogix in exchange for a 31% percent equity stake.  Wellogix also showed: that an Accenture employee believed that "BP work alone could generate annual fees . . . in excess of $20 million if Accenture controlled Wellogix"; that other companies viewed Wellogix's technology as valuable; that this value derived from Wellogix's complex services technology;  that no other company had such technology from 2000 to 2005; that, as discussed above, Accenture misappropriated Wellogix's trade secrets to develop complex services technology; that this misappropriation created a competitive disadvantage; that this disadvantage caused Wellogix's value to drop to "zero"; and that this disadvantage also caused Wellogix to lose out on potential deals with other oil and gas companies.

Accenture argues that Wagner's $27.8 million valuation was too speculative.[5]  Accenture notes that Wagner based his valuation on a decision by venture capital groups to invest in Wellogix  and that, in turn, the groups based their decision to invest on speculative projections that Wellogix "would suddenly begin reaping huge profits."  Accenture adds that the projections relied on information supplied by Wellogix, and not objective data, such as customer contracts.  However, Wagner testified that, before projecting Wellogix's value, the venture capital groups audited Wellogix's "financials"; made phone calls "to

---

[5] Wellogix argues that Accenture waived its challenge to the compensatory damages award.  However, in an oral motion, Accenture said: "[F]or the same reason, Your Honor, that we moved for judgment as a matter of law at the conclusion of Plaintiff's case, we so move at the conclusion of all the evidence. . . . We do not believe that there is any legally sufficient evidentiary basis for a reasonable jury to find  . . . damages."  The district court denied the motion, but noted: "That's all preserved."  Wellogix said that it had "[n]o objection to that."  Accordingly, Accenture did not waive its challenge. *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288 (5th Cir. 2007).

partners and customers"; "asked knowledgeable people . . . what they thought of the software"; and "tried to find out i[f] there [was] any competition." Wagner also testified that "it would be very unusual" if Wellogix did not supply information to the groups because "[t]hat is the source of most of your information when you[] come in and [are] asked to value a company." Given the "'flexible' approach used to calculate damages," *Bohnsack*, 668 F.3d at 280, reasonable jurors could find that the $8.5 million investment for a 31% stake, and the underlying projections, supported a $27.8 million valuation. *See Reeves*, 530 U.S. at 150.

Accenture argues that, notwithstanding Wagner's valuation, Wellogix did not show that the alleged misappropriation "totally or almost totally destroyed" Wellogix's value. Accenture maintains that Wellogix did not establish "the market value of the business immediately before and immediately after" the alleged misappropriation. However, Wagner testified that the investment and projections were made "right about the time that the theft occurred." Roman testified that, based on his knowledge of the software industry, "the total value of Wellogix went to zero" after the alleged misappropriation.[6] Reasonable jurors could find that this testimony established the "market value of the business immediately before and after" the alleged misappropriation. *Sawyer v. Fitts*, 630 S.W.2d 872, 875 (Tex. App. 1982); *see C. A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1053 (5th Cir. July 1981).

In sum, given the conflicting evidence and testimony, and resolving every inference in Wellogix's favor, *see* 530 U.S. at 150, reasonable jurors could find

---

[6] For the reasons, discussed below, that Roman's general background in computer sciences qualified him to testify about Wellogix's software, Roman's software expertise allowed him to offer his opinion as to the general effect Accenture's misappropriation of Wellogix's technology would have on Wellogix's value—particularly given that, as discussed above, Wellogix's value derived from this technology. *See Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

that Accenture misappropriated Wellogix's trade secrets.  Reasonable jurors also could find, under the "'flexible' approach used to calculate damages," *Bohnsack*, 668 F.3d at 280, that there was sufficient evidence to support a $26.2 million compensatory damages award.  As a result, the district court did not abuse its discretion by denying Accenture's motion for a judgment as a matter of law.

### III. Accenture's Motion for a New Trial

"This Court can overturn a decision denying a motion for a new trial only if it finds that the district court abused its discretion." *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991).  "The district court abuses its discretion by denying a new trial only when there is an 'absolute absence of evidence to support the jury's verdict.'" *Id.* (quoting *Cobb v. Rowan Companies, Inc.*, 919 F.2d 1089, 1090 (5th Cir. 1991)); *see Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (finding an abuse of discretion only if "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course.").  "In reviewing the district court's actions, the evidence is viewed in the light most favorable to the jury verdict." *Seidman*, 923 F.2d at 1140; *see Dotson v. Clark Equip. Co.*, 805 F.2d 1225, 1227 (5th Cir. 1986) ("A trial court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence.").

<u>1. Roman's Testimony</u>

"In rulings on the admissibility of expert opinion evidence the trial court has broad discretion and its rulings must be sustained unless manifestly erroneous." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987); *see Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997).  In making such rulings, district courts "function as gatekeepers and permit only reliable and relevant expert testimony to be presented to the jury." *Wilson*, 163 F.3d at 937 (citing *Daubert*, 509 U.S. at 590-93).  "District courts must be assured that the

proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson*, 163 F.3d at 937 (quoting FED. R. EVID. 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson*, 163 F.3d at 937; *see United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009). "'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting *Daubert,* 509 U.S. at 596).

Here, the district court did not abuse its discretion by allowing Wellogix software expert Roman to testify. Roman's experience as a software developer and forensic analyst, and his fluency in different programming codes, qualified him as an expert on the subject of his testimony: software programming and source codes. *See Wilson*, 163 F.3d at 937. Further, by limiting his testimony to whether Wellogix's source code was a trade secret, and whether Wellogix's code matched SAP's, Roman did not stray from this subject matter. *See id.*

Accenture argues that Roman's general computer sciences background did not qualify him to testify about "the oil-and-gas industry, complex-services procurement, or SAP software." However, Roman did not need particular expertise in the oil-and-gas industry, or complex services procurement, to help the jury understand software concepts and terms. *See* FED. R. EVID. 702(a). Further, Roman had "specialized knowledge" about SAP's software because he "testified that he had been able to teach himself [SAP's programming language] language and implement the SAP software." *See id.* Given that "Rule 702 does not mandate that an expert be *highly* qualified in order to testify about a given issue," *Huss*, 571 F.3d at 452 (emphasis added), Roman's background in computer science, and knowledge about SAP's software, sufficed.

17

No. 11-20816

Accenture argues that, even if Roman was qualified, his testimony was unreliable because he did not investigate the facts underlying his opinions. Accenture notes that Roman twice misstated facts in his testimony. First, Roman said that a Wellogix design specification was "an incredibly valuable trade secret" and "would not be known publicly" even though it was available on Wellogix's public website. Second, Roman compared Wellogix's source code to the wrong software, causing the district court to wonder how "[h]ow . . . somebody as experienced as Mr. Roman [could] be . . . that much off the point" and make "such a rudimentary mistake." However, Accenture had the chance to highlight and dispute these errors through "[v]igorous cross-examination" and the "presentation of contrary evidence." *Pipitone*, 288 F.3d at 250. In the context of Roman's broader testimony, two misstatements do not constitute "manifest[ ] erro[r]." *Viterbo*, 826 F.2d at 422.

Accenture renews its argument, discussed above, that Roman testified about matters outside his personal knowledge. However, as we noted above, Roman's testimony about the meaning of certain terms, and the availability of Wellogix's source code, was within his "experience, training, or education." *See Wilson*, 163 F.3d at 937. Likewise, Roman's testimony about Accenture's access to Wellogix's trade secrets, Accenture's breach of a confidentiality agreement with Wellogix, and Wellogix's post-tort value related to Wellogix's software, and therefore was within Roman's expertise. *See id.*; FED. R. EVID. 702.

2. Patent-Related Documents

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." FED. R. EVID. 401(a). A district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." FED. R. EVID. 403; *see Old Chief v. United States*, 519 U.S. 172, 180 (1997). "A trial court's ruling on admissibility under Rule 403's

18

balancing test will not be overturned on appeal absent a clear abuse of discretion." *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1153 (5th Cir. Sept. 1981); *see Old Chief*, 519 U.S. at 180. "We will not reverse a district court's evidentiary rulings unless they are erroneous and substantial prejudice results. The burden of proving substantial prejudice lies with the party asserting error." *F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1318-19 (5th Cir. 1994); *see Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir.1990).

Here, the district court did not abuse its discretion by allowing Wellogix to introduce into evidence documents—including emails and a patent demand letter—in which Accenture appears to acknowledge, among other things, that its infringement of Wellogix patents created "some potential for litigation." The district court, as requested by Accenture, instructed that "[t]he existence of a patent does not mean that a trade secret exists." As discussed above, "[a] jury is presumed to follow its instructions," *Weeks,* 528 U.S. at 234, and Accenture has not overcome this presumption in this instance. Also, noted earlier, without the documents, Wellogix presented sufficient evidence and testimony to support Wellogix's misappropriation claim. In addition, as discussed below, the documents are relevant to support other propositions, such as Accenture's malice to Wellogix. Although the district court observed in its order denying the motion for a new trial that, "from these emails, the jury was entitled to draw the inference that Accenture and BP had engaged in misappropriation of trade secrets," the record evidence does not support that the district court allowed the patent-related documents into evidence for this purpose.

Accenture argues that "the verdict itself shows the jury improperly relied on the" documents because the jury found that, by May 15, 2006—the date of the demand letter—Wellogix should have discovered Accenture's misappropriation. However, as the district court concluded, the jury's finding was proper because Wellogix framed the demand letter as "an indicator of the date by which

Wellogix was aware of Accenture's wrongful conduct with respect to Wellogix's intellectual property." For example, in its closing statement, Wellogix noted that the date of discovery was "a tough one," and that the demand letter suggested "the date of reasonable diligence when we discovered misappropriation." Given that Wellogix did not represent that the documents showed that Accenture misappropriated Wellogix trade secrets, the jury's use of the May 15, 2006 date, without more, does not overcome the presumption that the jury followed its instructions. *See Weeks*, 528 U.S. at 234.

In sum, the district court did not abuse its discretion by allowing Roman to testify about software because Roman's computer sciences background qualified him as an expert on software, and because he limited his testimony to that subject matter. The district court also did not abuse its discretion by allowing Wellogix to introduce into evidence patent-related documents because, among other things, the district court cautioned the jury that "[t]he existence of a patent does not mean that a trade secret exists." As a result, the district court did not abuse its discretion by denying Accenture's motion for a new trial.

## IV. The Punitive Damages Award

### 1. Malice

"When reviewing a district court's refusal to set aside an award of punitive damages, we will reverse only upon determining that 'no legally sufficient evidentiary basis' exists for making such an award, the same standard applied by the district court in the first instance." *Watson v. Johnson Mobile Homes*, 284 F.3d 568, 571 (5th Cir. 2002) (quoting FED. R. CIV. P. 50(a)(1)). A legally sufficient evidentiary basis exists if "the plaintiff proves by clear and convincing evidence that harm resulted from 'malice.'" *Bennett v. Reynolds*, 315 S.W.3d 867, 871 (Tex. 2010); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(2). "Malice" exists if there is "'a specific intent by the defendant to cause substantial injury [or harm] to the claimant.'" *Bennett*, 315 S.W.3d at 872 (quoting TEX. CIV. PRAC.

No. 11-20816

& REM. CODE ANN. § 41.001(7)). "[S]pecific intent," in turn, exists if "the actor desires to cause the consequences of his act, or he believes the consequences are substantially certain to result from it." *Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 22 (Tex. App. 2005) (citing *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985)). "Malice may be proven by direct or circumstantial evidence." *Marrs & Smith*, 223 S.W.3d at 22 (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998)).

Here, Wellogix introduced sufficient evidence and testimony to support the jury's finding that Accenture acted with malice. Wellogix showed: that Accenture stated that it could "easily replicate[ ]" and "[l]ift" Wellogix technology; that Accenture "harvest[ed]" Wellogix technology while engaged in confidential partnerships with Wellogix; that Accenture CEO Peggy Kostial wrote in a May 2006 email that "[o]ne can only hope" that SAP would no long "sponsor" Wellogix; that Accenture, in an apparent attempt to interfere with Wellogix's business relationship with SAP, warned Wellogix of SAP's "bleed the knowledge tactics"; that Accenture "acknowledge[d] its responsibility for patent infringement caused by products created by Accenture during those previous phases of the [P2P] project"; and that Accenture recognized that "[w]e may be at risk if Wellogix claims that we used knowledge of their product through involvement with eTrans to design and develop a solution for BP." Against the backdrop discussed above—Accenture's decision to develop the P2P pilot without Wellogix, and then apparently to "[u]se Wellogix content" for the "creation of . . . complex services" templates for the pilot—this evidence and testimony was sufficient to support the jury's malice finding. *See Marrs & Smith*, 223 S.W. 3d at 22-23 (finding that the defendant's attempts to interfere with the plaintiff's business relationships supported the jury's malice finding); *Nova Consulting Grp., Inc. v. Eng'g Consulting Servs., Ltd.*, 290 F. App'x 727, 741 (5th Cir. 2008)

(finding that "vulgarity about [the plaintiff] in [the defendant's] email . . . was evidence a reasonable jury could consider regarding malice").

Accenture argues that Wellogix did not show malice because Wellogix did not introduce clear and convincing evidence that Accenture intended to cause substantial injury to Wellogix. Accenture notes that Wellogix CEO Epley testified that he had "many positive relationships with Accenture personnel," that "Accenture was helpful" to Wellogix, that Accenture tried to warn Wellogix to protect its intellectual property from SAP, and that Accenture CEO Kostial was a "good friend." Accenture adds that Kostial wrote that she was "supportive" of Wellogix in a January 2006 email. However, Accenture does not cite, nor could we find, case law to support the proposition that a defendant's supportive comments about a plaintiff, or, conversely, a plaintiff's supportive comments about a defendant, preclude a jury's finding of malice. Rather, the jury was able to weigh Epley's comments, and Kostial's "support[ ]," against the evidence, discussed above, that Accenture "harvested" Wellogix technology. *See Reeves,* 530 U.S. at 150. "As an appellate court reviewing a cold record long after the jury has evaluated the evidence," *Richardson v. State*, 879 S.W.2d 874, 879 (Tex. Crim. App. 1993) (en banc), we decline to "reweigh th[is] evidence." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000) (internal quotation marks omitted).

2. Due Process

"[W]e review [a] constitutional challenge to the size of the punitive damages award de novo." *Lincoln v. Case*, 340 F.3d 283, 290 (5th Cir. 2003) (citing *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436 (2001)). "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416; *see TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 446 (1993). The Supreme Court has established "three guideposts courts should consider in determining whether a punitive damages award is unconstitutionally

excessive: the degree of the defendant's reprehensibility or culpability; the disparity between the harm or potential harm suffered by the victim and the punitive damages award; and the sanctions authorized or imposed in other cases for comparable misconduct." *Lincoln v. Case*, 340 F.3d 283, 292 (5th Cir. 2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996)).

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575). "Reprehensibility" factors include whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident

*State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576-77). "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *State Farm*, 538 U.S. at 419.

"[T]he potential relevance of the ratio between compensatory and punitive damages is indisputable, being a central feature in our due process analysis." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 507 (2008); *see Gore*, 517 U.S. at 580-82 ("The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree."). Although "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, we have determined that few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Baker*, 554 U.S. at 501 (internal citations and quotation marks omitted); *see State Farm*, 538 U.S. at 425 ("Single-digit multipliers are more likely to comport with due process[.]"); *Pacific Mut. Life Ins.*

*Co. v. Haslip*, 499 U.S. 1, 23-24 (1991) (upholding as constitutional a punitive damages award "more than 4 times the amount of compensatory damages").

Here, the *Gore* guideposts at issue in this case—reprehensibility and the ratio between punitive and compensatory damages—do not require us to find that the punitive damages award was grossly excessive.

The "reprehensibility" guidepost is neutral. Some factors favor Accenture. For example, Wellogix does not dispute that "the harm caused was . . . economic," and that Accenture's conduct did not "evince[ ] an indifference to or a reckless disregard of the health or safety of others." *State Farm*, 538 U.S. at 419. Other factors favors Wellogix. For example, the jury's "malice" finding, discussed above, supports that "the harm was the result of intentional malice." *State Farm*, 538 U.S. at 419. Other factors are ambiguous. For example, the evidence that Wellogix's value derived from its complex services technology, and that this value plummeted when Accenture misappropriated the technology, suggests that Wellogix was "financial[ly] vulnerab[le]." *State Farm*, 538 U.S. at 419. However, the Supreme Court neither has defined "financial vulnerability," nor has addressed whether a corporation can be financially vulnerable in this context. *Cf. State Farm*, 528 U.S. at 433-34 (finding that an elderly couple was "economically vulnerable"). As a result, we cannot say that the "financial vulnerability" factor favors either party.

The "ratio" guidepost strongly favors Wellogix. The ratio of punitive to compensatory damages in this case is $18.2 million to $26.2 million, or about 0.7:1. Although we decline to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable." *Gore*, 582, 517 U.S. at 583 (quoting *TXO*, 509 U.S. at 458), this 0.7:1 ratio is within the "[s]ingle-digit [ratio] likely to comport with the due process." *State* Farm, 538 U.S. at 425; see *Haslip*, 499 U.S. at 23-24.

No. 11-20816

Accenture argues that "[o]ther courts have reduced punitive damages awards to far less than 1:1 ratios because the awards were not necessary to punish or deter." However, the cases Accenture cites—*Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 990, 998-1001 (6th Cir. 2007); *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 463-70 (3d Cir. 1990)—are distinguishable. The punitive damages award in *Magnuson* was three times the amount of the compensatory damages award, *see* 487 F.3d at 990; the punitive damages award in *EBI* was $2 million more than the compensatory damages award, *see* 181 F.3d at 450. By contrast, the punitive award in this case is $8 million *less* than the compensatory award. Accenture does not identify, nor could we find, a case in which an appellate court vacated or reduced a punitive award that was less than the compensatory award. Given that the reprehensibility guidepost was neutral, we decline to do so in this case.

In sum, there was sufficient evidence and testimony to support the jury's "malice" finding. In addition, the amount of the punitive damages award was not grossly excessive. As a result, the district court did not err by refusing to set aside the punitive award.

## V. Conclusion

Accordingly, we AFFIRM the district court's judgment.