United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 26, 2006**

Charles R. Fulbruge III
Clerk

REVISED JANUARY 26, 2006

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

--------

No. 04-20873

--------

CARBO CERAMICS, INC.,

                                    Plaintiff-Appellant,

versus

TERRY P. KEEFE,

                                    Defendant-Appellee

--------

Appeal from the United States District Court for
the Southern District of Texas

_____

Before REAVLEY, DAVIS and WIENER, Circuit Judges.

REAVLEY, Circuit Judge:[*]

    The summary judgment denying Carbo recovery on its breach of fiduciary duty

and misappropriation of trade secrets (tort) claims is affirmed, not because of lack of

evidence to support those claims, but because of lack of legally recoverable actual

--------

    [*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should
not be published and is not precedent except under the limited circumstances set forth in
5TH CIR. R. 47.5.4.

1

damages.  The award for breach of contract found by the jury is supported by the evidence and is reinstated.  Without actual damages for the tort claims, no punitive damages could be recovered.  Because the liability finding of the jury on Carbo's misappropriation claim is supported by the evidence, and there is a genuine issue of material fact as to Carbo's breach of fiduciary duty claim, Carbo may renew its claim for an injunction on remand.

A.

To uphold the award for breach of contract, we must overcome the order for a new trial.  Our review of the evidence explains our rulings on both of the district court's orders.

We review a district court's decision to grant or deny a motion for new trial for abuse of discretion.  *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982).  "Where a motion for new trial is granted, we scrutinize the decision more closely." *Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005) (citation omitted).  A district court may grant a new trial if the jury verdict was against the great weight of the evidence.  *Shows*, 671 F.2d at 930.  We review the evidence closely to ensure that this difficult standard has been met.  *Id.*  Three factors guide us—the simplicity of the issues, the extent to which the evidence is in dispute, and the absence of any pernicious or undesirable occurrence at trial.  *Id.*  When these three factors are not present it is more appropriate to affirm the district court's decision, recognizing its first-hand knowledge of the course of the trial.

*Id.* However, "[w]hen all three factors are present, our deference to the jury is reinforced by our confidence in its ability to understand the issues, to evaluate credibility and sort through conflicting testimony, and to act reasonably and fairly in the absence of prejudicial influences." *Id.* at 931. Therefore, when the three factors are present, "there is little, if any, need to defer to the judge as against the jury, and we will not affirm an order granting a new trial unless on review we are satisfied, independently, that the jury verdict was against the great weight of the evidence." *Id.*

We turn to whether the three *Shows* factors are present in this case. The issues in this case were not overly-complicated. While there was technical testimony regarding ceramic manufacturing and patents, nevertheless, technical testimony should not as a matter of law preclude a jury from being able to comprehend and address the issues in this case. *Cf. Spurlin v. General Motors Corp.*, 528 F. 2d 612, 620-21 (5th Cir. 1976) ("[j]uries are constantly being called upon to pass upon negligent design issues in products liability area, and the sometimes confusing amount and type of technical testimony ... should not as a matter of law have precluded the jury that heard the case from being able fully to comprehend ... [the] issues involved."). Further, although the evidence in this case was disputed, there were numerous areas of agreement between the parties. Finally, there were no allegations that the case was improperly tried, or that counsel on either side made prejudicial statements and, accordingly, there was no "pernicious" event at trial. The *Shows* factors are present and we need not defer to the

3

judge as against the jury, and we will not affirm an order granting a new trial unless on review we are satisfied, independently, that the jury verdict was against the great weight of the evidence. *See Spurlin*, 528 F. 2d at 621.

The evidence in the record satisfies us that the jury finding that Keefe misappropriated trade secrets and that he failed to comply with the confidentiality agreement were supported and not against the great weight, and that the damage award for breach of contract was supported. We therefore hold that the district court abused its discretion in granting a new trial on the *liability* issues for Carbo's misappropriation claim. Then we hold that the district court abused its discretion in granting a new trial on the *liability* and *damages* issue for Carbo's breach of contract claim. It follows that the record does not support summary judgment on Carbo's misappropriation and breach of contract claims. As for Carbo's breach of fiduciary duty claim, the jury was not instructed on the issue and was not asked to find that Keefe breached his fiduciary duty. Further, there was a genuine issue of material fact as to whether Keefe breached his fiduciary duty.

The holding of the district court on the absence of proof of trade secrets was critical to the district court's grant of new trial and summary judgment. We begin with Keefe's confidentiality agreement and the evidence of trade secret misappropriation.

In granting Keefe's motion for a new trial, the district court held that Carbo failed to identify what information it claimed to be confidential, other than the alleged trade

4

secrets, which the district court found were not, in fact, trade secrets. The district court

also held that the damage awards were not supported by the evidence.

The facts show that Keefe signed a confidentiality agreement with Standard Oil,

Carbo's predecessor-in-interest. Carbo purchased the rights to the confidentiality

agreement when it purchased the Alabama plant from Standard Oil. That agreement

requires Keefe "not to disclose to others outside the Company, nor to use for yourself or

for others any confidential information which you may originate or acquire while you are

employed by the Company...." Confidential information is defined as:

> any technical, economic, financial, marketing or other information which is
> not common knowledge among competitors or other companies who may like
> to possess such confidential information or may find it useful. Some examples
> in our business might be items in research or development, scientific studies
> or analyses, details of training methods, new products or new uses for old
> products, refining technology, merchandising and selling techniques, customer
> lists, contracts and licenses, purchasing, accounting, business systems and
> computer programs, long-range planning, financial plans and results, etc. This
> is merely illustrative and confidential information is not limited to the
> illustrations.

Further, the confidentiality agreement provided:

> The Company wants you to use on your job all information which
> is generally known and used by persons of your training and experience and
> all information which is common knowledge in the industry but does not want
> you to disclose any confidential information belonging to any former
> employer which you are legally or ethically bound not to disclose.

The rationale the district court provided in granting the new trial on the breach of

contract claim was that Carbo failed to identify what information it claimed to be

confidential, other than the alleged trade secrets, which the district court found were not,

5

in fact, trade secrets. Thus, our analysis of this issue necessarily turns on whether the district court's determination that the great weight of the evidence showed that Carbo's alleged trade secrets are disclosed in three patents and that Carbo failed to show specific and identifiable trade secrets. Thus, we turn to the evidence relating to the existence of a trade secret.[1]

In its complaint Carbo alleged the following, among others,[2] to be trade secrets: (1) the unique combination of specifications, sequence, manufacturing steps,

---

[1]At the outset, we note that a trade secret "is one of the most elusive and difficult concepts in the law to define." *Lear Sieglar, Inc. v. Ark-Ell Springs, Inc.,* 569 F.2d 286, 288 (5th Cir. 1978). In many cases, the question of whether certain information constitutes a trade secret ordinarily is best "resolved by a fact finder after full presentation of evidence from each side." *Id.* at 289. The Texas Supreme Court has held that to determine whether there is a trade secret protected from disclosure or use, a court must examine six relevant but nonexclusive criteria: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). The court further held that "the party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time." *Id.* at 740. Determining whether any given piece of information is entitled to trade secret protection, then, is a contextual inquiry, which must evaluate a number of factors.

[2] Carbo alleged nine trade secrets in its second amended complaint. We need not analyze all of the alleged trade secrets as the jury was only required to find the existence of at least one trade secret to support its verdict.

6

characteristics and components employed by Carbo in manufacturing high strength proppant (HSP) and developed by experimentation, trial and error over more than twenty years and (2) Carbo's business plans and strategies, including pricing, industry trends, customers and customer preferences, and current and historical financial data. We address the evidence supporting each alleged trade secret in turn.

Carbo contends that its overarching trade secret is its proppant manufacturing process—the unique combination of specifications, manufacturing steps, characteristics and components employed by Carbo in manufacturing HSP and developed by experimentation, with trial and error over more than twenty years. The district court concluded that the greater weight of the evidence revealed that Carbo's manufacturing processes was in the public domain through patents. After reviewing the record, we conclude that there was conflicting evidence regarding whether the patents revealed Carbo's manufacturing process.

Dr. Richard Bradt, Carbo's expert witness, testified that the interrelationship of all the steps in Carbo's process is critical to achieving the product that Carbo desires.[3] Steve Canova, technical services development engineer at Carbo's McIntyre, Georgia plant, described Carbo's manufacturing process and testified that it is unique to Carbo. He

---

[3] We recognize that the district court *sua sponte* excluded Dr. Bradt's testimony in granting summary judgment. However, Dr. Bradt was permitted to testify at trial. Further, even without Dr. Bradt's testimony, there was sufficient evidence both on which the jury's decision could rest and to defeat summary judgment.

further testified that "each of [Carbo's] steps has specifications associated with it, and we have to hit those specifications to have a sealable, good product."

Canova and Dr. Bradt also testified that the patents provide only general information. Canova stated, "[t]he patents are really so broad there's not much more new information that I can use there." He also explained that there are thousand of possible combinations of set points contained within the patents. Dr. Bradt stated, "[t]he patents are very general and they give ranges for different aspects of production that the patents provide only general information."

There was testimony from Carbo that two of the patents were insufficient to create a commercially-viable proppant. Canova testified that it was "highly unlikely" that someone would be able to make a commercially acceptable proppant based on the Seider patent. He also testified that "you could probably make a proppant" but it was "very unlikely" that you could make a commercially viable proppant from the Fitzgibbon patent. He continued that having Carbo's "know-how," in addition to the patents, would be helpful.

Keefe testified that Carbo's alleged trade secrets were not in fact trade secrets. He testified that Carbo's manufacturing process is well known within the industry and revealed through the patents.

Given the existence of conflicting evidence from which a reasonable person might draw differing conclusions, it is clear that the jury could have concluded–and apparently

8

did conclude–that the patents did not reveal Carbo's trade secrets. Therefore, the district court abused its discretion in granting a new trial on that basis.

In granting the new trial, the district court did not specifically discuss Carbo's claim that its business plans and strategies, including pricing for its products as well as detailed information regarding industry trends, customers and customer preferences developed by Carbo over many years, and current and historical financial data, were trade secrets.

Jesse Orsini and Mark Pearson provided testimony regarding Carbo's marketing and pricing strategy, including information about where Carbo prefers to try to price its products relative to its competitor. Carbo provided evidence about its business plans and customer relationships, in particular, relationships with the "service companies" who use the proppants on behalf of the ultimate customer. Carbo provided documentary evidence of its 2001 business plan that was marked "confidential" and a January 2001 performance report. Vitek testified that Carbo has significant financial information, including its production costs, research and development costs, and trend information, the usefulness of which extends much longer than the particular time period in which those costs are incurred, and further, specifically references the evidence cited in the business plan and performance report above. Vitek also testified that much of Carbo's business and financial information is not disclosed in its annual report.

On the other hand, there no is evidence that Keefe took any written materials with

9

him when he resigned from Carbo. Keefe testified that Carbo's financial plans, pricing and projections are subject to market conditions and energy costs, time sensitive and would be obsolete from the time Keefe could open a plant. He further testified that pricing is well-known in the industry. The jury was not required to believe–and apparently did not believe–Keefe's self-interested testimony; but rather, believed Carbo's rendition of the facts.

Accordingly, there was abundant evidence for a reasonable jury to conclude that Carbo had a trade secret in its business plans and strategies, including pricing for its products as well as detailed information regarding industry trends, customers and customer preferences.

In granting the new trial, the district court stated that Carbo did not produce evidence to show that Keefe has plans to use any of the alleged trade secrets. To prove an action for trade secret misappropriation, Carbo must establish that Keefe used or disclosed the trade secret in breach of a confidential or contractual relationship that it had with the plaintiff. *Hyde Corp. v. Huffines,* 314 S.W.2d 763, 769 (Tex. 1958); *Trilogy Software v. Callidus Software*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied). "'Use'" of a trade secret means commercial use, by which a person seeks to profit from the use of the secret." *Trilogy Software*, 143 S.W.3d at 463 (citing *Atlantic Richfield Co. v. Dresser Indus.*, 789 S.W.2d 389, 395 (Tex. App.—Houston [14th Dist.] 1990, writ denied). Any misappropriation of trade secrets, followed by an exercise of

10

control and domination, is considered a commercial use. *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 542 (5th Cir. 1974); *Garth v. Staktek Corp.,* 876 S.W.2d 545, 548 (Tex. App.—Austin 1994, writ dism'd). "[C]ommercial use encompasses using a product design to procure financing for development of that product." *Garth*, 876 S.W.2d at 548. In *Garth*, the party charged with misappropriation of trade secrets used the trade secret to complete a basic design for a competing device, consulted a patent attorney about protection of the competing device, and sought financing for the competing product from investors. The appellate court affirmed the trial court's holding that using a trade secret to design a competing product for which a patent application was then submitted comprised a "commercial use." The appellate court also held that using the product designed through use of the trade secret to procure financing for development of the product was a "commercial use" of the trade secret. *Id.*

Keefe conceded that he used Carbo's information:

Q. So you will agree with me, won't you sir, that you took what you learned, both positive and negative, from your experience at Carbo and tried to put it in place here in the Keefe proppant plant, didn't you?
A. By your definition, yeah, I used my experience with Carbo and without Carbo and put in there.
Q. What you learned at Carbo, good and bad?
A. Sure.

Further, there was testimony and documentary evidence that Keefe used Carbo's financial information in his own financial estimates. While Keefe testified that the numbers he used were only a "wild ... guess," the evidence showed similarities between

11

Keefe's projections and Carbo's financial numbers, at least one projection being the same as Carbo's. Carbo's damage expert, Brian Benoit, testified that certain items in Keefe's financial plans "were the same types of analyses and line items that were included in the Carbo plan" and that Keefe's projections were "very well done and, in some respects, very similar to the Carbo plan." He also stated that he was not aware of any public source for the information found in Keefe's projections. In addition, Keefe's brochures specifically included Carbo's prices. Keefe admitted that he copied Carbo's pricing information verbatim, specifically referred to Carbo's McIntyre facility by name in his pricing sheets, and when asked what research he did other than look at Carbo's information, he testified "that's about it." Accordingly, we cannot conclude, as the district court did, that Carbo produced no evidence showing that Keefe has plans to use Carbo's alleged trade secrets.

In granting the new trial on the breach of fiduciary duty claim, the district court held that the jury's finding that Keefe failed to prove that his actions between January 7, 2001, and May 7, 2001, were within the scope of his privilege to prepare or make arrangements to compete with Carbo is against the great weight of the evidence. The district court held that all of the evidence showed that Keefe did nothing more than make reasonable preparations or arrangements to compete with Carbo prior to leaving its employment. The district court further held that the great weight of the evidence is that Keefe was a loyal and productive employee of Carbo until his resignation on May 7,

12

2001. After a careful review of the record, there was conflicting evidence as to whether Keefe was a loyal and productive employee of Carbo. There is no dispute that Keefe, as an officer of Carbo, owed Carbo a fiduciary duty. In fact, Keefe admitted that he owed Carbo a duty of undivided and unselfish loyalty. There was evidence that would allow a reasonable jury to conclude that Keefe was not giving Carbo his undivided and unselfish loyalty beginning in January 2001, when he was unhappy with his work and had decided that it was "time to go," until May 2001, when he eventually resigned. The evidence supporting Keefe's misappropriation of trade secrets is set forth above and is sufficient to defeat Carbo's motion for summary judgment as to the breach of fiduciary duty liability issue. However, the jury was not instructed on the issue and was not asked to find that Keefe breached his fiduciary duty.

B.

In granting the new trial on Carbo's breach of contract claim, the district court held that the $45,000 award for breach of contract did not come from the damage evidence offered. Paul Vitek, Carbo's Senior Vice President of Finance and Administration, testified that Carbo wanted to be reimbursed for the compensation that Keefe took from Carbo while he was, in fact, working for himself during his last four months of employment. The evidence showed that Carbo paid Keefe $45,000 as his base salary during those four months. The district court held that the $45,000 award was against the great weight of the evidence because it presumes Keefe did not work for

13

Carbo during those four months, but only worked on his project.

Carbo contends that the jury could have easily found, and apparently did find, that Carbo did not get the use of Keefe's services during his last four months at Carbo. Carbo also argues that the jury could have used Keefe's salary as a way to estimate all of the lost employee time that Keefe's evidence-gathering cost Carbo, including time Carbo spent learning about Keefe's evidence-gathering after he left. We agree and hold that the jury's damage award is supported by and was within the range of the evidence presented.

C.

Next we come to the problem of damages for the misappropriation of trade secrets and breach of fiduciary relations.

In an action for trade secret misappropriation, the plaintiff can recover actual damages based on the value of what has been lost by the plaintiff or the value of what has been gained by the defendant. *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535-36 (5th Cir. 1974) (applying Georgia law).[4]

The value of what has been lost by the plaintiff is usually measured by lost profits. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 89-90 (Tex. 1973); *Elcor Chem.*

---

[4] While *University Computing* was a decision under the Georgia law of trade secrets, Georgia, like Texas, bases its law of trade secrets on the Restatement of Torts § 757 (1939). In addition, at least one Texas appellate court has relied on *University Computing. See Garth v. Staktek Corp.*, 876 S.W.2d 545, 548 (Tex. App.—Austin 1994, writ dism'd w.o.j.).

14

*Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204, 214 (Tex. App.—Dallas 1973, writ ref'd n.r.e.). To recover lost profits, a party must introduce "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) (citations omitted).

The value of what the defendant has gained as a result of the misappropriation can be measured by a number of methods. First, the plaintiff can seek damages measured by the defendant's actual profits resulting from the use or disclosure of the trade secret (unjust enrichment). *Elcor Chem. Corp.*, 494 S.W.2d at 214; *University Computing*, 504 F.2d at 536 (defendant's profits may be appropriate measure of damages when defendant used trade secrets to improve manufactured items sold for profit). Second, the plaintiff can seek damages measured by the value that a reasonably prudent investor would have paid for the trade secret. *Precision Plating & Metal Finishing Inc. v. Martin Marietta Corp.*, 435 F.2d 1262, 1263-64 (5th Cir. 1970). Third, the plaintiff can seek damages measured by the costs saved by the defendant. *University Computing*, 504 F.2d at 538-39. This is typically shown through saved development costs. *See, e.g., Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 709-10 (9th Cir. 2003) (affirming award of $9 million, measured by three years' saved time at a "burn rate" of $3 million per year).

Finally, the plaintiff can seek damages measured by a "reasonable royalty." *Elcor Chem. Corp.*, 494 S.W.2d at 214; *Metallurgical Indus., Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986); *University Computing*, 504 F.2d at 536-39. The royalty is

15

calculated based on what a willing buyer and seller would settle on as the value of the trade secret. *Metallurgical Indus.*, 790 F.2d at 1208; *University Computing*, 504 F.2d at 539.

In *University Computing*, this court recognized that a reasonable royalty method provides a means of measuring the benefit to the defendant, which is the appropriate measure of damages where the secret has not been destroyed, where the plaintiff is unable to prove specific injury, and where the defendant has gained no actual profits by which to value the worth to the defendant of what it misappropriated. 504 F.2d at 536. In calculating what a reasonable royalty would have been had the parties agreed, the trier of fact should consider the following factors: (1) the resulting and foreseeable changes in the parties' competitive posture; (2) prices paid by licensees in the past; (3) the total value of the secret to the plaintiff, including the plaintiff's development cost and the importance of the secret to the plaintiff's business; (4) the nature and extent of the use the defendant intended for the secret; and (5) whatever other unique factors in the particular case might have been affected by the parties' agreement, such as the ready availability of alternative process. *Metallurgical Indus.*, 790 F.2d at 1208.

The only evidence regarding damages for misappropriation came from Brian Benoit, Carbo's damage expert witness. Benoit is the managing director of Houston's Standard and Poor's office. Benoit was asked to analyze Carbo's manufacturing trade secrets and provide his opinion as to their value to Keefe, not to Carbo. He stated that the

16

appropriate approach is to look at the profit of the overall misappropriating business and then determine what portion of that overall profit ought to be given to the owner of the trade secret. He engaged in the "profit-split method" where a portion of the profit is split between a company that is going to use the trade secrets (Keefe) and the company that actually owns the trade secrets (Carbo). Benoit first examined the revenue projections that Keefe put together for his proposed plant over a ten year period. He tested Keefe's proposed projections for accuracy and then compared them to Blumberg Financial Resources data, which includes industry revenue, costs, and profit. He also compared Keefe's plan to Carbo's business plan. He analyzed Keefe's business plan and determined what the revenue, cost, and profit would be.

Keefe's business plan was for ten years and Benoit assumed that the trade secrets would have benefit to Keefe for the ten years. He stated that he looked at texts and found that the value of the trade secrets can be as long as the product's life. He stated that Keefe's product is going to last for more than ten years. He also spoke with a number of management directors around the United States with Standard and Poor's and asked them if ten years seemed reasonable; they agreed that ten years seemed liked a reasonable useful life of a trade secret.

He then determined the portion of the profits from Keefe's business plan that would be attributable to Carbo's trade secrets. He applied the Goldscheider Rule, which states that approximately 25 percent of gross profit should be attributable to intangible

17

assets, in this case, the manufacturing trade secrets of Carbo. Benoit stated that he analyzed the historical performance of Carbo and looked at what portion of Carbo's business comes from intangible assets and determined that 90 percent of Carbo's value comes from its intangible assets. He noted that 25 percent would be a reasonable percentage of profit for Keefe to share with Carbo for the use of its trade secrets. He concluded that Keefe would improve the process each and every year and therefore reduced that 25 percent profit split every year by 2 ½ percent.

Based on Keefe's projected revenues over ten years of $238,500,000, Benoit calculated that Keefe's operating profit would be $95,961,000. He then applied 25 percent as the percentage of profit allocated to Carbo's trade secrets for the first year and then decreased the percentage of profit 2 ½ percent for each of the next nine years. The total profit attributable to Carbo's trade secrets was $9,308,614. He then discounted this number to the present value of $3,900,000.

While Carbo's damage theory, by and through the expert testimony of Benoit, does not fit within any of the damage theories outlined above, we recognize that plaintiffs are entitled to adapt their damage theory to fit within the particular facts of the case. However, the fundamental problem with Carbo's theory of damages, as we see it, is the starting point—Keefe's projected revenues. It is undisputed that Keefe has neither built a plant nor produced a product. Hence, any damage model based on speculative revenues and operating profit from an unbuilt plant, is in an of itself, inherently speculative.

18

*Metallurgical Indus.*, 790 F.2d at 1208 (the value of trade secrets should not "be based on sheer speculation"). We could find no case that permits a theory of damages that values a trade secret, based in part, on ten years of operating profits of a nonexistent plant.

In our opinion, Keefe's financial predictions, all of which serve as the foundation for Carbo's damage theory, are simply too speculative. Carbo's revenue projections and operating profits for Keefe's business enterprise, even if based on Keefe's own figures and estimations, are inadmissible because they are speculative projections based on "uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into an unknown or unviable market, or on the success of a new and unproven enterprise." *Texas Instruments v. Teletron Energy Mgt.,* 877 S.W.2d 276, 279 (Tex. 1994).

There is no sound and reliable evidence from which to derive a dollar value for the alleged trade secrets. We have no evidence of lost profits suffered by Carbo, no evidence of actual sales enjoyed by Keefe, no evidence of development costs saved by Keefe, no evidence as to what a reasonably prudent investor would have paid for the alleged trade secrets, and no evidence of a reasonable royalty for the alleged trade secrets. A plaintiff must introduce evidence "by which the jury can value the rights the defendant has obtained." *University Computing*, 504 F.2d at 545. Carbo has not met its burden in this respect. Because Carbo has failed to meet its burden of presenting sufficient evidence demonstrating a triable issue of material fact as to actual damages recoverable under its

19

trade secret misappropriation claim, we affirm the district court's grant of summary judgment as to that claim.

We turn to damages for breach of fiduciary duty. Carbo could recover actual damages for economic injuries that result from a breach of fiduciary duty. *See, e.g., Kahn v. Seely*, 980 S.W.2d 794, 799 (Tex. App.—San Antonio 1998, pet. denied) (lost profits).

The damage evidence in this case consists of (1) Benoit's testimony relating to the value of Carbo's trade secrets to Keefe and (2) the $45,000 in salary that Carbo paid Keefe for his last four months of employment. As explained above, Benoit's testimony is speculative and cannot serve as a basis for valuing a trade secret. And as explained, Carbo is entitled to the $45,000 jury award on its breach of contract claim, which is based on the $45,000 in compensation that Keefe received during the last four months of employment. Carbo cannot recover duplicative damages on its breach of contract and breach of fiduciary duty theories. *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 441 (5th Cir. 1987) (a party "cannot recover the same damages twice, even though the recovery is based on two different theories" ). Therefore, Carbo has presented no evidence of actual damages for its breach of fiduciary duty claim. Because Carbo has failed to meet its burden of presenting sufficient evidence demonstrating a triable issue of material fact as to actual damages recoverable under its breach of fiduciary duty claim, we affirm the district court's grant of summary judgment as to that claim.

While Carbo has failed to present a triable issue of material fact as to actual damages recoverable under its trade secret misappropriation and breach of fiduciary duty claims, we note that Carbo might be entitled to a permanent injunction, which it has requested. *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 780 (Tex. 1958); *DSC Comm. Corp. v. Next Level Comm. Corp.*, 107 F.3d 322, 328 (5th Cir. 1997). We leave it for the district court to decide on remand whether Carbo is entitled to an injunction.

D.

The summary judgment for Keefe on the tort claims is affirmed because of the lack of evidence of recoverable actual damages. The summary judgment for Keefe on the breach of contract claim is reversed and the jury award is to be reinstated. Because the liability verdict on the misappropriation of trade secrets withstands the erroneous grant of new trial and summary judgment, and there is a genuine issue of material fact as to Carbo's breach of fiduciary duty claim, Carbo is entitled to renew its motion for an injunction on remand.

JUDGMENT AFFIRMED IN PART; REVERSED IN PART; AND CASE REMANDED WITH INSTRUCTIONS.