# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————

No. 17-40059

————————

United States Court of Appeals
Fifth Circuit

**FILED**

February 15, 2018

Lyle W. Cayce
Clerk

In the matter of: EDWARD MANDEL

      Debtor

EDWARD MANDEL,

      Appellant

v.

STEVEN THRASHER; JASON COLEMAN,

      Appellees

------------------------------------------------------

In the matter of: EDWARD MANDEL

      Debtor

STEVEN THRASHER; LAW OFFICES OF MITCHELL MADDEN,
MADDENSEWELL, L.L.P., JASON SCOTT COLEMAN,

      Appellees

v.

EDWARD MANDEL,

      Appellant

No. 17-40059

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:15-CV-715
USDC No. 4:15-CV-743

Before KING, JONES, and ELROD, Circuit Judges.

PER CURIAM:*

Debtor-Appellant Mandel challenges the compensatory damage awards of the bankruptcy and district courts following remand by this court. Mandel also argues that the attorneys' fees awards should be vacated. We find no reversible error and AFFIRM.

## I.     BACKGROUND

This case involves several disputes between co-founders of the company White Nile. The facts underlying these disputes are laid out in this Court's first opinion in this matter. *See In re Mandel (Mandel I)*, 13-40751, 578 Fed. Appx. 376 (5th Cir. Aug. 15, 2014). Mandel and Thrasher initially created White Nile to develop Thrasher's invention. White Nile then hired Coleman as the chief creative officer. Mandel misappropriated White Nile's trade secrets and formed a new company, NeXplore. As explained in *Mandel I*, the bankruptcy court had held "Mandel liable for liable for (1) theft or misappropriation of trade secrets; (2) breach of contract; (3) breach of fiduciary duty; (4) fraud and fraudulent inducement; (5) oppression of shareholder rights; and (6) conspiracy." *Id.* at 382. It had awarded "$400,000 in damages to Coleman; $1,000,000 to Thrasher; and $300,000 to White Nile." *Id.*

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

No. 17-40059

*Mandel I* affirmed the liability holdings but remanded to the bankruptcy court so it could "either conduct an additional evidentiary hearing on the issue of damages or explain its award of damages on the basis of the evidence in the present record." *Id.* at 382, 391.

A. THE BANKRUPTCY COURT'S OPINIONS

### a. Thrasher's Damages

On remand, the bankruptcy court again awarded Thrasher $1,000,000 for Mandel's trade secret misappropriation. *In re Mandel*, 10-40219, 2015 WL 5737173, at *9 (Bankr. E.D. Tex. Sept. 30, 2015). This time, the court described four different theories that could support the damage award to Thrasher.

First, the court assessed what a reasonable royalty for the trade secrets would have been based upon the settlement agreement that was announced, but never finalized, in the state court case between Mandel, Thrasher and Coleman. *Id.* at *7. This agreement provided for a $900,000 judgment to Thrasher and Coleman as well as a minimum royalty fee of $2,500 quarterly for five years. *Id.* The bankruptcy court reasoned as follows:

> [T]he announced settlement agreement suggests an appropriate damages award would be $1,010,000, consisting of the $900,000 agreed judgment, a royalty fee of $30,000 for three years of minimum quarterly payments of $2,500 per quarter, and a royalty fee of $80,000 arising from a two-year license Mandel testified NeXplore signed in October 2010.

*Id.*

Second, the court assessed damages under a lost asset theory. *Id.* at *8. At trial, Thrasher and Coleman had presented expert evidence of Brad Taylor, who testified that companies comparable to White Nile were worth between $1 million and $344 million. *Id.* The bankruptcy court held that "White Nile's value is closest to the lowest valued company on Taylor's list of companies, which is $1 million." *Id.* The bankruptcy court came to this conclusion because it took "into account the significant rate of failures [of comparable companies],

3

No. 17-40059

the dysfunctional executive team [of White Nile], the lack of a functional product, NeXplore's abandonment of its efforts to create its own search engine, and the lack of profits by White Nile and NeXplore." *Id.*

Third, the court assessed damages by determining the benefit that Mandel received from his misappropriation. *Id.* at *9. Again, the court relied on the opinion of Coleman and Thrasher's expert Taylor:

> According to the claimants' expert, Brad Taylor, the market capitalization of NeXplore was $47.17 million at the high end and $1.67 million at the low end – thus indicating a value range of $25.9 million to $920,000 for the value of Mandel's 55% interest. White Nile was a nascent search market company with no financing, no usable product, no customers, no profit, and a dysfunctional executive team who engaged in litigation over control of White Nile and its intellectual property. This Court, therefore, again looks to the low end of the market capitalization spectrum for NeXplore in calculating damages for misappropriation, which is $920,000.

*Id.* The court noted that it did not take Mandel's salary and other benefits into account because "the trial record did not establish that Mandel received his salary or benefits on account of misappropriation." *Id.* at *9 n.9.

Fourth, the court stated that it "also considered the amount of investments NeXplore secured using ideas and materials very similar to those prepared for White Nile." *Id.* at *9. The court reasoned that "NeXplore raised approximately $2.5 million from investors before abandoning its attempt to create its own search engine. This would indicate a value of $1,375,000 attributable to Mandel's 55% interest in NeXplore." *Id.*

Taking all of this evidence into account, the court awarded $1 million dollars to Thrasher for misappropriation of trade secrets. *Id.* The court also found that Thrasher should be awarded $300,000 for Mandel's fraudulent misrepresentation "that he would invest $300,000 in White Nile in order to induce Thrasher to do business with him." *Id.* at *6. However, the court

awarded Thrasher $1 million in total because it held that Thrasher's misappropriation damages "are co-extensive with and subsume the damages he incurred on account of his other compensable claims against Mandel." *Id.* at *9.

### b. Coleman's Damages

The bankruptcy court awarded Coleman $400,000 in damages for misappropriation, which the court held were "subsumed by and co-extensive with his fraudulent inducement damages." *Id.* The court arrived at this number by examining Coleman's consulting agreement with White Nile, which would have provided him with $133,000 each year for three years as well as "an approximately 0.5% equity interest in White Nile." *Id.* The court found that "[b]ased on the Court's valuation of White Nile, the value of a 0.5% of an equity interest in White Nile is approximately equal to the amount White Nile paid Coleman." *Id.*

### c. Attorneys' Fees

The bankruptcy court held that *Mandel I* did not vacate the court's initial award of attorneys' fees and therefore declined to alter its initial award. *Id.* at *6.

### d. Damages to White Nile

After a motion for reconsideration, the bankruptcy court held that *Mandel I* did not vacate the court's initial award of $300,000 in compensatory damages to White Nile. *In re Mandel*, 10-40219, 2016 WL 1178441, at *7 (Bankr. E.D. Tex. March 23, 2016). However, the court described what it would do if the damages award had been vacated. The court explained that it initially awarded $300,000 in damages for Mandel's "breach of his non-disclosure agreement with White Nile, breach of his fiduciary duty to White Nile, and fraud." *Id.* at *5. If the award were vacated, the bankruptcy court would award an additional $197,000 to White Nile, which is the amount that Mandel

diverted from White Nile's bank account to NeXplore. *Id.* at \*7. The bankruptcy court rejected White Nile's arguments that it was entitled to the salary Mandel received from NeXplore or other investments received by NeXplore. *Id.* at \*5-7.

B. THE DISTRICT COURT'S OPINION

The district court affirmed the bankruptcy court's orders on all damage determinations other than the damages for White Nile. *Mandel v. Thrasher*, 4:15-cv-715, 2016 WL 7374428 (E.D. Tex. Dec. 20, 2016). On Thrasher's damages, the district court's analysis differed in a couple of respects. First, it held that the bankruptcy court had not awarded damages based on the failed state court settlement, but had merely "pointed out that Thrasher argued in closing that the [settlement] was some evidence of a reasonable royalty rate and that the ultimate amount of damages that the bankruptcy court awarded to Thrasher was similar to the agreed upon sum in the [settlement]." *Id.* at \*11 (internal citations omitted). Second, the court held that the bankruptcy court had not actually accepted the benefit of misappropriation theory, since it stated that "the trial record did not establish that Mandel received his salary or benefits on account of misappropriation." *Id.* at \*12. The district court upheld the bankruptcy court's assessment of damages under the lost asset theory. *Id.* at \*11.

As for Coleman's damages, the district court clarified the bankruptcy court's order by providing a rationale for using Coleman's contract to assess his misappropriation damages:

> . . . Coleman assigned his intellectual property rights to White Nile in exchange for a $133,000 annual salary for three years, plus a 0.5% equity interest in White Nile. The agreement between Coleman and White Nile is some evidence of the value of Coleman's intellectual property rights, and thus, evidence of the value of White Nile's trade secrets, to Mandel. Three years of Coleman's annual salary of $133,000 would have totaled $399,000. The

No. 17-40059

bankruptcy court valued White Nile at $1 million. 0.5 percent of $1 million is $5,000. In sum, the value of Coleman's salary plus the value of his equity interest in White Nile, as promised under the contract, is roughly $400,000. When measured against the peculiar facts and circumstances of this case, valuing the damages to Coleman for Mandel's misappropriation of Coleman's trade secrets by determining the value of Coleman's initial contract with White Nile fits within the flexible and imaginative approach used to calculate damages in a case like this one, as condoned by the Fifth Circuit in *Wellogix*.

*Id.* at *13 (footnote and citation omitted).

The district court held that *Mandel I* had vacated White Nile's damages award because "(1) Thrasher brought claims both individually and derivatively on behalf of White Nile; (2) the Fifth Circuit affirmed the findings of the bankruptcy court regarding the claims on which White Nile prevailed; and (3) the Fifth Circuit vacated the entire compensatory damages award." *Id.* at *13. The district court increased the award to White Nile by $197,000 for the reasons given in the bankruptcy court's opinion. *Id.* at *15.

The district court affirmed the bankruptcy court's award of attorney's fees. *Id.* at *13.

## II.    STANDARD OF REVIEW

This Court applies the same standards of review to the bankruptcy court's order as those employed by the district court. *Matter of Hawk*, 871 F.3d 287, 290 (5th Cir. 2017). Therefore, it reviews "questions of fact for clear error and conclusions of law de novo." *Matter of Cowin*, 864 F.3d 344, 349 (5th Cir. 2017).

## III.    ANALYSIS

As noted above, *Mandel I* remanded the compensatory damages awards to the bankruptcy court. *Mandel I* explained:

Damages need not be proved with great specificity. A flexible approach is applied to the calculation of damages in a

misappropriation of trade secrets case. "Where the damages are uncertain ... we do not feel that the uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown." It is sufficient that the plaintiff demonstrates "the extent of damages as a matter of just and reasonable inference" even if the extent is only an approximation.

In the present case the bankruptcy court did not make clear the theory upon which it was relying to award damages nor did it explain the evidence supporting the amount of damages. While it is true that uncertainty should not preclude recovery in a trade secrets misappropriation case, Thrasher and Coleman were required to produce enough credible evidence to show "the extent of the damages as a matter of just and reasonable inference," even if the "result be only approximate." From the bankruptcy court's opinion we do not see an approximation—only numbers chosen by the court.

. . .

Because neither the bankruptcy court nor the district court explained the evidentiary and legal basis for the damages awarded, we are unable to review the damages adequately. Because, however, Thrasher and Coleman did suffer some damage, we vacate the award of compensatory damages and remand to the bankruptcy court so that it may either conduct an additional evidentiary hearing on the issue of damages or explain its award of damages on the basis of the evidence in the present record.

578 Fed. Appx. at 390-91 (footnotes omitted).

*Mandel I* quoted from *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867 (5th Cir. 2013), which gives some examples of ways to assess trade secret misappropriation damages:

Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret, the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a reasonable royalty.

8

No. 17-40059

578 Fed. Appx. at 390 (quoting *Wellogix*, 716 F.3d at 879).   This flexible approach has been approved by the Texas Supreme Court, which has held that "[a] 'flexible and imaginative' approach is applied to the calculation of damages in misappropriation-of-trade-secrets cases." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 710 (Tex. 2016) (quoting *Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir.1974)).   Texas requires "reasonable certainty" to establish lost profits, but not for other methods of assessing damages.   *See id.* at 711-12 ("[L]ack of certainty does not preclude recovery.").

A. THRASHER'S DAMAGES

Mandel challenges all four of the methodologies employed by the bankruptcy court to assess Thrasher's damages.   Mandel argues that the bankruptcy court violated the law of the case doctrine by crediting damage models and expert testimony it had previously rejected.   However, as explained by the district court, the bankruptcy court did not violate the law of the case doctrine because *Mandel I* vacated the bankruptcy court's opinion regarding compensatory damages.   *See Mandel v. Thrasher*, 2016 WL 7374428 at \*11; *Mandel I*, 578 Fed. Appx. at 391.   Thus, "anything that the bankruptcy court decided regarding compensatory damages in its initial Findings of Fact and Conclusions of Law is not the law of the case." *Mandel*, 2016 WL 7374428, at \*11.

Mandel challenges the damages award based on the lost asset theory because it relies on Taylor's testimony.   Mandel argues this was improper because "Taylor did not include failed companies in his valuation—and the vast majority of Internet search engine startups fail."   Furthermore, Mandel criticizes the bankruptcy court for merely picking a number within a range provided by the expert, rather than accepting the value proposed by the expert. However, as outlined above, the bankruptcy court did not merely pick a

number within a range but gave a reasonable explanation for choosing a number at the lower end of the expert's testimony. The bankruptcy court also accounted for the "significant rate of failures" of comparable companies in its analysis. *In re Mandel*, 2015 WL 5737173, at *8. Furthermore, under Texas law, a "jury generally has discretion to award damages within the range of evidence presented at trial." *Sw. Energy Prod. Co.*, 491 S.W.3d at 713. The bankruptcy court sitting as factfinder is entitled to the same amount of deference.

Mandel also argues that the use of the lost asset theory is not suitable to value the misappropriation. Mandel argues this is the case because he did not destroy or otherwise prevent Thrasher from using those trade secrets. Under *Wellogix*, however, the correct inquiry is what the misappropriation did to the market value of the company, not whether or not the trade secret was destroyed. In *Wellogix*, this Court upheld a judgment of compensatory damages for trade secret misappropriation that was equal to the value of the company (after deducting licensing fees) before the misappropriation. *Wellogix*, 716 F.3d at 879. This was because the "misappropriation created a competitive disadvantage" that "caused Wellogix's value to drop to 'zero.'" *Id.* at 880. Therefore, because White Nile's value dropped to zero after the trade secrets were misappropriated, the bankruptcy court did not clearly err or violate this Court's mandate by assessing damages on this theory.

Mandel argues it was improper for the bankruptcy court to rely on the failed state court settlement. Thrasher and Coleman appear to agree, because instead of responding to this argument they state that "the bankruptcy court clearly did not seek to support its damages award on remand for misappropriation based upon the failed state court settlement." Because this

No. 17-40059

Court finds the award was supported under the lost asset theory, it need not address this issue.[1]

Mandel also challenges the award to Thrasher for fraud, breach of contract, and breach of fiduciary duty. These damages are subsumed within the misappropriation damages. Therefore, because this Court upholds the misappropriation damages, there is no need to address these other arguments.

Without having cross-appealed, but in further response to Mandel's contentions, the Appellees argue that, "if the bankruptcy court erred with respect to its re-evaluation of [their] expert's testimony it[] only did so by woefully undervaluing the IP and the damages awarded." They also argue that the bankruptcy court could have awarded much larger sums using NeXplore's value or investments. Given the bankruptcy court's compelling reasons for choosing numbers at the lower end of Taylor's testimony, the bankruptcy court did not clearly err or violate this Court's mandate by awarding claimants much less than they asked for.

B. COLEMAN'S DAMAGES

Mandel argues that the award to Coleman is improperly based upon Coleman's void contract with White Nile. However, as explained by the district court, this contract merely provides some evidence of a reasonable royalty for Coleman's intellectual property that was misappropriated by Mandel. *Mandel I* held that "the damages awarded must have some rational relationship to the evidence presented." *Mandel I,* 578 Fed. Appx. at 391. The district court has

---

[1] Mandel also challenges the other two damage theories that were discussed by the bankruptcy court: the interest of NeXplore Mandel received as a result of the misappropriation or the investments NeXplore acquired using "ideas and materials very similar to those prepared for White Nile." 2015 WL 5737173, at *9. This Court need not address these arguments in detail because Thrasher's damages may be upheld on the lost asset theory. However, these theories do provide further evidence that the bankruptcy court had reasonable justifications for the $1,000,000 award to Thrasher.

11

No. 17-40059

adequately explained how the value of Coleman's contract has a rational relationship to the value of his misappropriated intellectual property.

Mandel also challenges the award to Coleman for fraudulent inducement and conspiracy. However, these damages were subsumed by the misappropriation damages. Therefore, because this Court upholds the misappropriation damages, there is no need to address these other arguments.

C. WHITE NILE'S DAMAGES

Mandel and the appellees agree that *Mandel I* vacated the bankruptcy court's initial award of $300,000 to White Nile. Mandel challenges both awards to White Nile. First, Mandel correctly points out that the bankruptcy court and district court failed to provide an explanation for the $300,000 award. If Mandel's representation to Thrasher that he would invest $300,000 in White Nile can support this award, then the award may be upheld on this basis. Mandel argues this would be improper because Texas law does not allow benefit-of-the-bargain damages for fraud. He cites a Texas Supreme Court case that holds "[w]hat the plaintiff might have gained is not the question, but what he had lost by being deceived into the purchase." *George v. Hesse*, 93 S.W. 107, 108 (Tex. 1906). However, it appears that the Texas Supreme Court has held the opposite more recently: "Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure." *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). No matter the resolution of this possible conflict, however, both the loss and benefit-of-the-bargain to White Nile were the same, $300,000.

Second, Mandel argues that White Nile is not entitled to the $197,000 award because Mandel didn't divert these funds. Rather, he argues that he "refunded the funds to the Laynes . . . . [and] the Laynes later invested those same funds in NeXplore." Mandel argues that it was proper for him to "refund"

12

No. 17-40059

the investment to the Laynes because he defrauded the Laynes into making the investment in the first place. However, as stated by the bankruptcy court, he breached his fiduciary duty to White Nile by releasing these funds.

D. ATTORNEY'S FEES

Mandel argues that *Mandel I* vacated the attorney's fees awards because actual damages must be found in order to award attorneys' fees. He also argues that *Mandel I* must have vacated attorneys' fees because he argued in *Mandel I* that the award should be vacated if the actual damages were vacated. However, *Mandel I* explicitly found that Claimants "suffered some damage" and affirmed the attorneys' fees to Coleman. *Mandel* I, 578 Fed. Appx. At 391. *Mandel I* also only explicitly vacated the compensatory damages award. *Id.* at 392. Therefore Mandel's appeal on this ground is meritless.

IV.   CONCLUSION

For the foregoing reasons, we conclude that the bankruptcy and district courts fulfilled this court's mandate on remand. Neither clear error nor legal error occurred on remand. The judgment of the district court is **AFFIRMED**.

13

No. 17-40059

JENNIFER WALKER ELROD, Circuit Judge, dissenting:

I agree with the majority opinion that it was permissible for the bankruptcy court and district court to reconsider the evidence on remand without running afoul of the mandate rule or violating the law of the case doctrine. Indeed, we specifically instructed the bankruptcy court that "it may either conduct an additional evidentiary hearing on the issue of damages or explain its award of damages on the basis of the evidence in the present record." *In re Mandel*, 578 F. App'x 376, 391 (5th Cir. 2014) (*Mandel I*). However, the majority opinion errs in holding that the revised method used, which the bankruptcy court had previously rejected, provides a just and reasoned basis for awarding damages. While we allow flexible and creative approaches for approximating damages in misappropriation cases, that flexibility can only stretch so far before it snaps. That is what happened here. Therefore, I respectfully dissent.

I.

Our caselaw cannot be bent to support the award of unproven damages. A holistic view of our cases shows that there are limits to how far our flexible and creative standard can be stretched. We recognize that damages can be uncertain in trade secret cases and "do not feel that uncertainty should preclude recovery," which is why we allow flexibility in calculating damages. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013). "[P]laintiffs are entitled to adapt their damages theory to fit within the particular facts of the case" and should be afforded every opportunity to prove damages once misappropriation is shown. *Id.*; *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 724 (5th Cir. 2006). Even when approximating a damages award, however, the evidence must show "the extent of damages as a matter of just and reasonable inference." *Wellogix*, 716 F.3d at 879. But *Wellogix* is

14

not a magic incantation that can be used to obviate the limits of that flexible approach, which are expressed in the caselaw on which *Wellogix* directly relies. *See id.* (citing *University Computing Co. v. Lyke-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974) and *Carbo Ceramics, Inc. v. Keefe,* 166 F. App'x 714 (5th Cir. 2006)).

In *Carbo*, we held that damages were too speculative because there was no evidence of: (1) lost profits; (2) actual sales by the defendant; (3) development costs saved; (4) what a reasonably prudent investor would have paid for the trade secret; or (5) a reasonable royalty.  166 F. App'x at 724–25. We stated that "any damage model built on speculative revenues and operating profit from an unbuilt plant, is in an[d] of itself, inherently speculative." *Id.* at 724.

In *University Computing*, we stated that while "every case requires a flexible and imaginative approach to the problem of damages . . . [c]ertain standards do emerge from the [caselaw]."   504 F.2d at 538–39.   These standards primarily require that the defendant "must have actually put the trade secret to some commercial use." *Id.*  The usual approach is to measure the value of the secret to the defendant through lost profits, a reasonable royalty, or development costs, or the value of the secret to the plaintiff if a specific injury can be proven.  *Id.* at 535–38*; see also* James Pooley, Trade Secrets § 12.04(2)(f) (2017) (stating a plaintiff may establish the value of its secret "through the amount of effort or money invested in its development, the willingness of others to pay for securing access to it, and the various ways in which using the information improved the efficiency or success of the plaintiff's business").  In most cases, "the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade

No. 17-40059

secret to the use defendant intended at the time the misappropriation took place." *Id.* at 535.

In sum, our caselaw allows for flexibility and imagination in awarding damages but also mandates that any such award still be tethered to a non-speculative evidentiary anchor and based upon a theory appropriate to the harm in the case. *See also* James Pooley, Trade Secrets § 7.03(2)(a) (2017) ("Which [theory], alone or in combination, should be pursued depends upon the facts of the case."). As detailed below, that standard was not met here.

## II.

In *Mandel I*, we determined that the award of compensatory damages to Thrasher, Coleman, and White Nile could not be supported on a record where the bankruptcy court had rejected all proposed damages models. *Id.* at 390–91. The error was not with the bankruptcy court's carefully reasoned explanation of why it rejected the various models as not suited to the facts of the case. *See id.* at 389–90. The error was that, even having rejected the damages models, the bankruptcy court proceeded to award damages, and we could not evaluate whether that award was correctly calculated without knowing the model the bankruptcy court used. *Id.* at 391 ("Because neither the bankruptcy court nor the district court explained the evidentiary and legal basis for the damages awarded, we are unable to review the damages adequately.").

Importantly, we discussed in detail the bankruptcy court's rejection of the "lost asset" theory and the evidentiary deficiencies with that damages model. *Id.* at 389. *Mandel I* was a cross-appeal and whether the bankruptcy court properly rejected the "lost asset" damage model was a question expressly before the court. Thrasher and Coleman had explicitly argued that *Wellogix* supported the award of damages, and even greater damages, based on the

No. 17-40059

evidence at trial. *Id.* at 390. If the lost asset theory was viable based on the evidence from the original trial, we could have affirmed the award of damages on that basis. Instead, we held that without knowing which damages model was used, we could not review whether the model was appropriate to the case or the evidence was sufficient to support the amount awarded under that model. *Id.* at 390. We explained that "Thrasher and Coleman were required to produce enough *credible evidence* to show 'the extent of the damages as a matter of just and reasonable inference,' even if the 'result be only approximate.'" *Id.* at 390 (emphasis added).

On remand, without an evidentiary hearing, the bankruptcy court awarded $1,000,000 to Thrasher based on the lost asset theory, $400,000 to Coleman based on the value of his consulting contract, and it also determined that the initial $300,000 award to White Nile had not been vacated by *Mandel I. In re Mandel*, No. 10-40219, 2015 WL 5737173, at *1 n.1, *9 (Bankr. E.D. Tex. Sept. 30, 2015). The district court affirmed the award of compensatory damages to Thrasher and Coleman, and determined that, White Nile's damages were vacated in *Mandel I*, but that White Nile was entitled to $497,000 in damages. *Mandel v. Thrasher*, Civil Action No. 4:15-cv-715, 2016 WL 7374428, at *11–15 (E.D. Tex. Dec. 20, 2016)

## III.

I turn first to the award of damages to Thrasher based on the lost asset theory. The bankruptcy court awarded Thrasher damages based on a theory that it had characterized in its first opinion as "not helpful for determining damages based on the facts of this case." *In re Mandel*, No. 10-40219, 2011 WL 4599969, at *28 (Bankr. E.D. Tex. Sep. 30, 2011); *Mandel v. Thrasher*, Civil Action No. 4-11-cv-774, 2013 WL 336729, at *10 (E.D. Tex. July 3, 2013) (same). We did not disagree with that characterization of the lost asset theory

17

No. 17-40059

in *Mandel I. See* 578 F. App'x at 389. The initial explanation of the evidentiary deficiencies with the lost asset theory bears repeating: (1) the valuation of White Nile by expert Brad Taylor "fail[ed] to adequately account for the extremely high failure rate of companies like White Nile"; (2) expert Dr. Gilbert F. Amelio testified that any potential profitability in White Nile would not become bankable for years, if ever, and that 80% of similar companies fail to become profitable; (3) Dr. Amelio testified he had done no due diligence on White Nile specifically and was unsure whether he would invest; (4) the "evidence of NeXplore's fair market value [was], at best, fuzzy"; (5) Mandel's salary from NeXplore was not an indication of the company's value; and (6) the Laynes' investment in White Nile was not credible evidence of value because it was made based on false information. *In re Mandel,* 2011 WL 4599969 at *27. The bankruptcy court's initial observations about the flaws in this evidence were correct, and it should not have second-guessed itself on remand.

The majority opinion dodges the inconsistency in the bankruptcy court's evaluation of the lost asset theory on remand by explaining that *Mandel I* vacated the compensatory damage award and did not bind the bankruptcy court to its prior findings under the law of the case doctrine. Simply because the bankruptcy court was not bound by that prior finding does not mean that any evidentiary defects that led the court to reject the lost asset theory were suddenly remedied. The fact that we held that Thrasher and Coleman suffered some damages did not transform a theory for which there was no rational relation to the evidence into a basis for the award of damages. *See Mandel I,* 578 F. App'x at 391. The lost asset theory is not an appropriate damages model here where the technology is not yet functional and the potential profitability of the company is purely speculative. *See Carbo,* 166 F. App'x at 724.

18

The majority opinion contents itself with the bankruptcy court's about-face by stating there was a "reasonable explanation for choosing a number at the lower end of the expert's testimony" and that the failure rate of comparable companies was accounted for in that analysis. Even assuming, *arguendo*, that the lost asset damages model is appropriate to use here, this logic fails to account for the inherently speculative nature of selecting a value for White Nile anywhere within Taylor's range. Taylor's valuation range only relied on data for successful companies and did not account for the specific risks of White Nile failing. *See Mandel v. Thrasher*, 2013 WL 3367297 at *10. That risk cannot be factored into the analysis on the back-end simply by picking a number at the low end of the range. These risk factors, as the bankruptcy court recognized, were significant: there was "the dysfunctional executive team, the lack of a functional product, NeXplore's abandonment of its efforts to create its own search engine, and the lack of profits by White Nile and NeXplore." *In re Mandel*, No. 10-40219, 2015 WL 5737173 at *8. Simply because an expert creates a value range of technology companies does not necessitate that the value of the company at issue falls within that range.

White Nile, based on its specific risk factors, could have been valueless. Taylor's model assumes the ability to get a product to market and secure the backing of investors. The evidence presented at trial makes it doubtful that White Nile would do so. Puzzlingly, the bankruptcy court seemed to acknowledge this, even on remand, stating that: White Nile's executive team was not "capable of transforming an idea into a viable business" and "even before the misappropriation occurred, White Nile was having difficulty raising the funds necessary for development costs in sufficient time to beat competitors." *Id.* The evidence here did not support an award of damages

anywhere within Taylor's value range as a matter of just and reasonable inference. This was speculation all the way down.

The majority opinion further claims that because "White Nile's value dropped to zero after the trade secrets were misappropriated," the holding in *Wellogix* supports the award of damages. Far from supporting the majority opinion, the evidence supporting the damages award in *Wellogix* only further illustrates the speculative nature of the evidence here. In *Wellogix*, the damage expert's valuation of the company at $27.8 million was based on: (1) the decision by venture capital groups to invest $8.5 million for a 31% equity stake; (2) that an employee of the misappropriating company believed one application of the intellectual property alone could generate $20 million in annual fees; (3) other companies viewed the technology as valuable; (4) no other company had the technology at issue for a period of five years; and (5) the venture capital groups had done significant auditing of the company's financials before investing. 716 F.3d at 879–80. An expert had testified that "based on his knowledge of the software industry, 'the total value of Wellogix went to zero' after the alleged misappropriation." *Id.* at 880.

Unlike in *Wellogix*, where there was a company-specific valuation based on credible evidence, here the expert never specifically valued White Nile based on its particular characteristics. White Nile had one investor whose investment was eventually returned, there was no indication that other companies found the technology valuable—even NeXplore failed to bring it to market—nor was there any indication that the technology (if ever actually developed) would be sufficiently unique to carve out a market share. The majority errs in comparing the evidence of White Nile's value in this case to *Wellogix*. A square peg cannot fit in a round hole.

No. 17-40059

IV.

The award of damages to Coleman fares no better.  The majority opinion without further analysis accepts the district court's conclusion that Coleman's consulting contract provides some evidence of a reasonable royalty.  Further examination shows that this too is an inappropriate basis on which to award damages.  The district court relied on the flexibility afforded by *Wellogix*, adopting a reasonable royalty standard as the measure of damages in expanding upon the bankruptcy court's finding of damages based on the contract.  *Mandel v. Thrasher*, 2016 WL 7374428 at \*12–13; *In re Mandel*, 2015 WL 5737173 at \*9.  The reasonable royalty standard is used to measure the value of the intellectual property to the misappropriating party.  *University Computing*, 504 F.2d at 537.  Even Coleman's attorney admitted at oral argument that the contract likely was not the best basis for awarding damages but argued we should defer to the bankruptcy court as a factfinder.

A salary contract is not an appropriate basis to use to calculate the value of misappropriated intellectual property here.  *See id.* at 537–38 (stating the reasonable royalty standard measures the value of the intellectual property to person who misappropriated it); *cf. Carbo*, 166 F. App'x at 725 (holding that the value of the salary supported an award for breach of contract but not for a breach of fiduciary duty based on the misappropriation of a trade secret).  Coleman's consulting contract does not measure the value of the intellectual property in this case to Mandel, who misappropriated the technology.  It only measures the value of Coleman's services.  Coleman bears the burden to show that the value of his salary is co-extensive with the value of any intellectual property created.  *See Carbo*, 166 F. App'x at 725.  Showing that intellectual property rights were assigned in exchange for that salary does not prove the value of any intellectual property that Coleman actually created or what

21

No. 17-40059

intellectual property Mandel misappropriated. Moreover, we held in *Mandel I* that the assignment of Coleman's intellectual property rights to White Nile was void. 578 F. App'x at 385.

In addition, Mandel was not able to monetize any intellectual property that he misappropriated from Coleman. The SAQQARA project that Coleman created was not a working prototype. *In re Mandel*, 2015 WL 5737173 at *4. The evidence also shows that NeXplore decided not to create a search engine from scratch. *Id.* As such, Coleman's salary does not reflect the value of his final work product or the value to Mandel from any use of Coleman's work product. Our case law allows flexibility, but the reasonable royalty method cannot be bent to fit that scenario.

V.

The majority opinion also does not support its conclusion that the award of damages to White Nile of $497,000 was proper. Both the bankruptcy court and district court failed to explain the basis for $300,000 of the award. The majority opinion concludes, however, that "[i]f Mandel's representation to Thrasher that he would invest $300,000 in White Nile can support this award, then the award may be upheld on this basis." However, the majority opinion never undertakes the analysis to make that determination; it only refutes Mandel's argument that benefit of the bargain damages are not available for fraud under Texas law. *See Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex.1998). The availability of a remedy does not equate to the entitlement to that remedy. Benefit of the bargain damages for fraud claims are only available in limited circumstances. *See, e.g., Haase v. Glazer*, 62 S.W.3d 795, 799 (Tex. 2001) (holding benefit of the bargain damages are not available if the claim is barred by the statute of frauds); *D.S.A., Inc. v. Hillsboro ISD*, 973 S.W.2d 662, 663 (Tex. 1998) (stating

22

No. 17-40059

benefit of the bargain damages are not available for negligent misrepresentation claims). The majority opinion never explains whether Mandel's representation supports a claim for which benefit of the bargain damages are available, and if available, whether that claim supports an award of damages to White Nile.

VI.

Today, we affirm an award of damages that uses damages models that cannot be justified by any reasonable inference from the evidence in this case. We give deference to the bankruptcy court as the fact-finder. But that deference only extends as far the credible evidence can support its findings. Here, there was no reasoned basis for the award that would merit deference. These models do not have credible evidence supporting them as a reasonable approximation of the intellectual property's value. The evidence of White Nile's value was too speculative to use as a reasonable approximation of the technology misappropriated. If anything, given the pre-existing management and capital-raising issues, the evidence indicated the company was valueless when the technology was misappropriated. Indeed, in the twelve years that the parties have been litigating over White Nile, no party has actually been able to monetize the technology.

Valuing intellectual property is hard, and the misappropriation of that technology is potentially as easy as a download to a flashdrive. The difficulty of determining a correct valuation methodology, however, does not excuse the burden to show that the technology's value rises above mere speculation and is based on just and reasonable inferences from the credible evidence. Our flexible and creative standard is not a license for pie-in-the-sky damages; rather, damages must be grounded both in theory and fact. Respectfully, I dissent.

23